This is an action for actionable negligence. The plaintiff testified that on 26 August, 1926, he was driving a Maxwell touring car; with him in the car were Mrs. W. R. Absher and her daughter. Going east from Asheville, N.C. on Highway No. 10, between 5 and 6 o'clock in the evening, when approaching the village of Glen Alpine, he noticed a truck in front of him. It was being driven in the center of the highway. He drove up and slowed down behind the truck and blew his horn. "He (the driver of the bread truck) began to pull over to the left of the road and continued pulling over to the left until he was almost in front of the garage there, and he almost came to a stop. I don't know that he did stop, but he was very slow, and he turned across to the right very suddenly right in front of me. When he pulled towards the left, his car went off of the pavement. I was still on the pavement on the right-hand side. There was nothing to obstruct my line of vision down the right-hand side of the highway. It was a straight line and no cars were coming. There was nothing in my right of way on my right-hand side when he drew his truck in front of me. I slowed up until he went off of the highway and then I speeded up. I had my car under control, and when the truck went across the road I threw my car suddenly to the right to keep from going head on. He gave no signal that I saw or heard. The truck is about 17 feet long, I imagine, or more, and it was about two feet, as well as I remember, off the pavement on the right-hand side; the front wheel of the truck was about two feet off the pavement on the right-hand side. It was that way after the wreck, when the truck stopped. It extended back across the highway about five feet. When the truck came in front of me, I suddenly turned to the right to keep from going head on into the truck. Then I ran off and turned over a wall. . . . When he threw his car across the road in front of me, of course it was just like that (quick movement), and I was right on him, and I threw my car to the right very suddenly. It was the only thing I could do or hit him. When his truck was in that position, I could not turn to the left to pass him because I was almost on him. . . . (Cross-examination) I will swear now that I don't know whether I did nor did not blow my horn to signal that I desired to pass. . . . There was a wide place on the north side of the highway in front of the garage, on the left-hand side a good sized space. There was *Page 316 
not plenty of room to have passed on the left. There was abundant room north of the highway to have passed — about 90 feet. . . . I was aware of the fact that under the law it was my duty to notify the driver of that truck of the fact that a car was in the rear and desired to pass and afford him an opportunity of moving to the right of the center of that highway before I undertook to pass, and I did notify him. I thought he was going to park there. I thought that, although his car was still in motion, and there was nothing on the right-hand side for him to turn into except that vacant lot. I saw the filling station on the south side of the highway and did not know but what he was going to enter it. I knew that under the rules regulating traffic on the highway that it was my duty to slacken the speed of my car and, if necessary, to stop it and delay my effort to pass until he had gone to the right of the center of the highway and afforded room to pass on the left of the truck, and that it was a violation of the law and indictable if you passed or attempted to pass on the right of the truck. He had surrendered the right of way and left it to me; had left the highway to a certain extent. The two wheels were off, but I can't say whether he had stopped the truck or not. I will not tell the court and the jury that I did not pay enough attention to it to tell them whether the truck had stopped or was in motion. I just say that I don't know. . . . This sounding of the horn that I spoke of was some distance from the garage, about 150 or maybe 200 feet west of the garage, I should think. I could not have passed the truck on the left. There would have been no accident if I had delayed my effort to pass until the highway was clear on the left of the truck, and I could have delayed it. So far as I know, the driver of that truck did not know that I was in the rear. He did not give any signal to let me know that he knew I was back there." (Redirect examination.) "He did not give me any signal that he was turning in. I did not know that he was parking there. Q. You were asked a while ago if you had stopped and waited for that truck to turn across and go in there would there have been no accident. If he had stopped where you signalled him, would there have been any accident? A. There would have been no accident. . . . It was so sudden the way the truck came across in front of me that I did not have time to think of anything."
Mrs. W. R. Absher testified in part: "I did not notice the bread wagon until it started to pull across the highway, but I noticed it when it started pulling directly across the highway over to the left. At that time Mr. Stevens was driving about 15 or 20 miles an hour. He did blow his horn. The driver of the truck was pulling directly across, and when Mr. Stevens blew his horn — he blew it more than once — but after he had blown his horn the driver of the truck looked out like that *Page 317 
(illustrating) and saw us, because I saw his face distinctly; then he pulled right on across the highway to the left. There was just a lot on the left-hand side of the highway as far as I know. He had already seen us coming, because I saw his face. The truck pulled across the highway, and when it pulled across the highway the way was clear in front. The next thing I knew about the truck it was suddenly in front of us, and we either had to hit it or . . . . It was going across the last time, coming back to the right. It had already crossed to the left and was coming back across the highway. Mr. Stevens' car could not have been more than five feet from the truck when it came across the road. Mr. Stevens turned his car suddenly to keep from hitting the truck, abruptly to the right. Pardon me; I am trying to tell it just as I saw it. The car came back so close and so suddenly that he could not do anything but hit him or go off."
Mrs. G. P. Sherrill testified in part as follows: "I was sitting east of the depot, and there was not a thing to obstruct my vision down to the garage there. I saw his car and then the truck coming down the highway, coming from the direction west going in the direction east, and I saw this Valdentian Bakery truck. It suddenly pulled to the left-hand side of the highway, and this car was coming on the right-hand side; and as the truck pulled to the left-hand side of the highway, it turned directly in front of this car, and the car run off of the embankment at the garage at Glen Alpine. . . . It seems to me that the truck looked like it pulled all the way off the highway, and it suddenly turned directly across the highway in front of this car. The Stevens' car at that time was on the highway on the right-hand side and it pulled right in front of this car. It did not come back to the left. . . . As far as I remember, and as far as I could see, Stevens' car had not left the highway at all until the truck came suddenly in front of him. . . . I said it seemed to me that it got all the way off the road — off of the hard surface and then turned suddenly across in front of this car on the highway."
At the close of the plaintiff's evidence, defendants moved for judgment as in case of nonsuit. C. S., 567. Motion allowed. Plaintiff excepted, assigned error and appealed to the Supreme Court.
C. S., 2617, in part, is as follows: "Whenever a person operating a motor vehicle shall meet on the public highway any other person riding or driving a horse or horses or other draft animals, or any other vehicle, the person so operating such motor vehicle and the person *Page 318 
so riding or driving a horse, horses, or other draft animals, shall reasonably turn the same to the right of the center of such highway so as to pass without interference. Any person so operating a motor vehicle shall, on overtaking any such horse, draft animal, or other vehicle, pass on the left side thereof, and the rider or driver of such horse, draft animal, or other vehicle shall, as soon as practicable, turn to the right so as to allow free passage on the left."
Plaintiff's testimony is conflicting in some respects, but the credibility is for the jury. Shell v. Roseman, 155 N.C. at p. 94; Shaw v.Handle Co., 188 N.C. at p. 236. We think under the plaintiff's evidence, in the light most favorable to him, the issues of negligence, contributory negligence and damages, should have been submitted to the jury. Dreher v.Devine, 192 N.C. 325, is not controlling under the facts in the present case.
As to proximate cause, see DeLaney v. Henderson, 192 N.C. at p. 651;Radford v. Young, 194 N.C. 747. As to sudden danger or emergency, seeRiggs v. Mfg. Co., 190 N.C. at p. 260; Fowler v. Underwood, 193 N.C. 402;Odom v. R. R., 193 N.C. 442.
Plaintiff's cause of action arose prior to Motor Vehicle Uniform Act, Public Laws of N.C. 1927, ch. 148, where the "Rules of the Road" are set forth. See, also, the North Carolina Code of 1927 (Michie), sec. 2621(44)et seq. For the reasons given, the nonsuit is
Reversed.